**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY, and
GEICO CASUALTY CO.,

    Plaintiffs,

vs.

SEAN MARTINEAU and SHAZAM AUTO
GLASS LLC,

    Defendants.

_____/

**Case No.:**

**Jury Trial Demanded**

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.    This action seeks to terminate an ongoing fraudulent scheme committed against

GEICO and, more broadly, the Florida automobile insurance industry, and to recover more than

$340,000.00 that the Defendants wrongfully have obtained from GEICO through the submission

of hundreds of fraudulent and unlawful claims seeking reimbursement for phony, unnecessary,

unlawful, and otherwise non-reimbursable windshield replacement services (hereinafter, the

"Glass Services") allegedly provided to individuals (hereinafter, the "Insureds") who were

eligible for glass replacement coverage under comprehensive automobile insurance policies

issued by GEICO.

2.      In addition to money damages, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in outstanding claims for Glass Services that have been submitted or caused to be submitted by the Defendants through Defendant Shazam Auto Glass LLC ("Shazam Glass"), because the claims were fraudulent, unlawful, and otherwise non-reimbursable in that they:

(i)      involved phony Glass Services that were not necessary, reparative, or in some cases actually performed;

(ii)     were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and

(iii)    were submitted through Shazam Glass, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance.

3.      As more fully described in this Complaint, this scheme was engineered by the Defendants to create the appearance that Shazam Glass was an actual glass replacement company that provided Glass Services to Insureds and was in possession of valid assignments of those Insureds' insurance benefits. In reality, Shazam Glass was simply a shell entity created and used by Defendant Sean Martineau ("Martineau") in furtherance of the Defendants' fraudulent scheme against GEICO, GEICO Insureds, and the Florida automobile insurance industry.

4.      In order to manufacture the large volume of fraudulent claims necessary to financially benefit themselves, the Defendants trained and directed a network of independent contractors to illegally obtain insurance information from Insureds through deceptive, unfair, and fraudulent means, or simply forge the Insureds' signatures on claims documents, and then to provide the information and "signatures" to the Defendants. The Defendants then used the illegally-obtained information and "signatures" to create fraudulent claims for Glass Services that they submitted to GEICO and other insurers.

2

5.      As discussed below, the Defendants at all relevant times have known that the charges for the Glass Services that they submitted, or caused to be submitted, to GEICO were fraudulent in that the charges:

    (i)      involved phony Glass Services that were not necessary, reparative, or in some cases actually performed;

    (ii)     were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and

    (iii)    were submitted through Shazam Glass, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Glass Services that they billed to GEICO.

7.      The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent and unlawful claims for Glass Services that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

8.      The Defendants' fraudulent scheme began in 2016 and has continued uninterrupted through the present day.

9.      As a result of the Defendants' scheme, GEICO has incurred damages of more than $340,000.00.

## THE PARTIES

### I.      Plaintiffs

10.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland. Each Plaintiff is therefore a citizen of Maryland. Each of the Plaintiffs was subjected to and the victim of the

3

same unlawful practices by the Defendants. GEICO is authorized to conduct business and to issue automobile insurance policies in the state of Florida.

**II.    Defendants**

11.    Defendant Martineau resides in and is a citizen of Florida. Martineau owns, controls, and is the sole member of Shazam Glass, and used Shazam Glass as a vehicle to submit fraudulent claims for Glass Services to GEICO and other insurers.

12.    Defendant Shazam Glass is a Florida limited liability company with its principal place of business in Florida. The sole member of Shazam Glass is Defendant Martineau, who resides in and is a citizen of Florida.  Shazam Glass therefore is a citizen of Florida. Shazam Glass was organized in Florida on or about January 1, 2016.  Together with Martineau, Shazam Glass caused fraudulent claims for Glass Services to be submitted to GEICO and other automobile insurers.

<strong>JURISDICTION</strong>

13.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

14.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

15.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

16.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of the Defendants reside and because this is

4

the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

17.     Plaintiff GEICO is an insurance company licensed and authorized to do business in the State of Florida. GEICO underwrites automobile insurance in Florida.

**I.      Automobile Insurance, the Motor Vehicle Repair Act and Reimbursement for Glass Services**

**A.      Comprehensive Insurance Coverage and Claims for Glass Services**

18.     Under Florida law, motorists are required to carry, at a minimum, insurance for personal injury protection ("PIP") and property damage liability ("PDL"). With limited exceptions that are not applicable here, PDL Insurance covers the costs of repairing property damaged by insureds in automobile accidents, and PIP Insurance covers the healthcare costs of Insureds who are injured in automobile accidents, regardless of who was at fault in the accidents.

19.     In addition to the required PIP and PDL Insurance, a large percentage of Florida automobile owners also carry comprehensive insurance coverage, which provides coverage beyond what is provided through mandatory coverages. Under comprehensive insurance coverage, repairs for damage to the insured automobile caused by factors other than collisions – such as weather damage – are covered regardless of fault, subject to specified exclusions and limits of liability as set forth in the pertinent insurance policy.

20.     In the event of damage to the windshield of an Insured's vehicle that has comprehensive insurance coverage, Florida law requires automobile insurers to replace or repair that Insured's damaged windshield with no deductible. See Fla. Stat. § 627.7288.

21.     In a legitimate windshield replacement setting, the windshield replacement process begins when the Insured submits a notice of loss to GEICO.

22.     GEICO has established multiple means in order to facilitate an Insured's submission of a notice of loss.  For example, an Insured can submit the notice of loss either by telephone, or via the internet through a computer or mobile application.

23.     Pursuant to Florida law – and as set forth in GEICO's comprehensive insurance policies – Insureds with comprehensive insurance coverage have the sole discretion to determine who will perform a repair/replacement of their windshields. GEICO does not restrict an Insured's choice of windshield replacement shops.

24.     As a result, as part of the notice of loss process, Insureds with comprehensive insurance coverage can identify the windshield replacement shop that they wish to perform the pertinent Glass Services.

25.     Following the notice of loss, an Insured can assign his or her right to comprehensive insurance coverage benefits – i.e., windshield replacement – to a preferred windshield replacement shop in exchange for the shop's performance of the Glass Services.

26.     Once the Insured identifies his or her preferred windshield replacement shop, GEICO transmits a work order to the Insured's selected shop. The work order sets forth the pricing parameters that GEICO will authorize for the proposed Glass Services.

27.     Then, pursuant to the Insured's assignment of benefits, the windshield replacement shop can perform the work and submit, via interstate wire transfer, its invoice and any other documents supporting performance of the Glass Services, together with the work order number, to GEICO's claims processing vendor located outside of the state of Florida, using an electronic billing or facsimile transmission system.

28.     The vast majority of all windshield replacements in Florida are billed, and payment is accepted, at the pricing parameters set forth in GEICO's work orders.

29.     Upon receipt of an invoice for windshield replacement services provided to an Insured with comprehensive insurance coverage, Florida law generally permits insurers such as GEICO only 30 days to handle the claim. See, e.g., Fla. Stat. § 626.9541. If insurers such as GEICO do not pay the claim within 30 days, or present some good reason for denying or investigating the claim, they can be liable to the Insured or the Insured's assignee for damages, as well as attorneys' fees, under the Florida Unfair Insurance Trade Practices Act. See id.; see also Fla. Stat. § 624.155.

30.     While the 30-day claims handling period helps to ensure that legitimate claims are paid in a timely manner, it also creates perverse incentives for unscrupulous windshield replacement fraud rings, such as the one operated by Defendants.

31.     GEICO receives hundreds of windshield repair or replacement claims from Florida Insureds or their assignees every day.

32.     Upon information and belief, other Florida automobile insurers similarly receive a very high volume of windshield repair and replacement claims each day. GEICO is only one of many automobile insurance companies in the Florida automobile insurance market, and it is improbable – to the point of impossibility – that only GEICO, and not the other insurers in the market, receives a very high volume of windshield repair and replacement claims each day.

33.     Unscrupulous windshield repair or replacement fraud rings – including Defendants – are aware of the fact that the volume of windshield repair and replacement claims in Florida, coupled with the limited amount of time in which insurers in Florida must handle those claims, limit the insurers' ability to identify and investigate suspicious claims.

34.     Unscrupulous windshield repair or replacement fraud rings, such as Defendants, routinely exploit these investigative and temporal limitations, by submitting a massive amount of

fraudulent windshield repair and replacement claims for illusory, unnecessary, and otherwise non-reimbursable services, often without the Insureds' knowledge or consent.

35.     In this context, the notice of loss process described above plays an important role in ensuring that the windshield repair and replacement claims that GEICO receives are legitimate.  Among other things, it ensures that the windshield repair and replacement shops actually have received legitimate assignments of benefits from GEICO Insureds. It also ensures that the Insureds are aware of the fact that the glass repair and replacement shops have purported to perform work on the Insureds' windshields, and have submitted claims for reimbursement under the Insureds' comprehensive insurance policies.

**B.     The Motor Vehicle Repair Act and Claims for Glass Services**

36.     With limited exceptions that are not applicable in the present case, the Florida Motor Vehicle Repair Act (the "Repair Act"), Fla. Stat. § 559.901, et seq., applies to all motor vehicle repair shops in Florida, including entities such as Shazam Glass that purport to provide Glass Services.

37.     The Repair Act defines "motor vehicle repair shop", in pertinent part, as "any person who, for compensation, engages or attempts to engage in the repair of motor vehicles owned by other persons and includes, but is not limited to: ... self-employed individuals; ... and shops doing glass work."

38.     The Repair Act requires all motor vehicle repair shops to register with the Florida Department of Agriculture and Consumer Services prior to doing business in Florida. See Fla. Stat. § 559.904.

39.     With limited exceptions that are not applicable in the present case, it is a violation of the Repair Act to, among other things:

(i)     engage or attempt to engage in Glass Services or other forms of motor vehicle repair work without first registering with the Florida Department of Agriculture and Consumer Services;

(ii)    have repair work subcontracted without the knowledge or consent of the customer unless the motor vehicle repair shop or employee thereof demonstrates that the customer could not reasonably have been notified;

(iii)   make or charge for repairs which have not been expressly or impliedly authorized by the customer;

(iv)    misrepresent that repairs have been made to a motor vehicle;

(v)     fraudulently alter any customer contract, estimate, invoice, or other document;

(vi)    misrepresent that the vehicle being inspected or diagnosed is in a dangerous condition or that the customer's continued use of the vehicle may be harmful or cause great damage to the vehicle;

(vii)   make or authorize in any manner or by any means whatever any written or oral statement which is untrue, deceptive or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue, deceptive or misleading;

(viii)  make false promises of a character likely to influence, persuade, or induce a customer to authorize the repair, service, or maintenance of a motor vehicle;

(ix)    cause or allow a customer to sign any work order that does not state the repairs requested by the customer or the automobile's odometer reading at the time of repair;

(x)     fail or refuse to give to a customer a copy of any document requiring the customer's signature upon completion or cancellation of the repair work; or

(xi)    perform any other act that is a violation of the Repair Act or that constitutes fraud or misrepresentation.

See Fla. Stat. § 559.920.

40.     Pursuant to the Repair Act, if the cost of the proposed repair work will exceed

$100.00, a motor vehicle repair shop must present to the customer a written notice conspicuously

disclosing the following statement, in a separate, blocked section, in capital letters of at least 12-

point type:

> **PLEASE READ CAREFULLY, CHECK ONE OF THE STATEMENTS BELOW, AND SIGN:**
>
> **I UNDERSTAND THAT, UNDER STATE LAW, I AM ENTITLED TO A WRITTEN ESTIMATE IF MY FINAL BILL WILL EXCEED $100.**
>
>     \_\_\_\_ **I REQUEST A WRITTEN ESTIMATE.**
>
>     \_\_\_\_ **I DO NOT REQUEST A WRITTEN ESTIMATE AS LONG AS THE REPAIR COSTS DO NOT EXCEED $_____ . THE SHOP MAY NOT EXCEED THIS AMOUNT WITHOUT MY WRITTEN OR ORAL APPROVAL.**
>
>     \_\_\_\_ **I DO NOT REQUEST A WRITTEN ESTIMATE.**
>
> **SIGNED**      **DATE**

See Fla. Stat. § 559.905(2).

41.     In the event that a motor vehicle repair shop provides the required disclosure notice to a customer pursuant to Fla. Stat. § 559.905(2), and the customer checks off one of the statements indicating that they do not request a written estimate, then the motor vehicle repair shop is not required to provide the customer with the estimated cost of the proposed repairs. See Fla. Stat. § 559.905(3). Otherwise, motor vehicle repair shops, including Glass Services providers, must provide a written repair estimate to an customer, setting forth – among other things – the estimated cost of the proposed repairs if the cost of the proposed repairs will exceed $100.00. See Fla. Stat. § 559.905(1).

42.     Pursuant to the Repair Act, it is unlawful for a motor vehicle repair shop to require a customer to waive his or her right to an estimate as a precondition to a repair. See Fla. Stat. § 559.907(2).

43.     Pursuant to the Repair Act, it is unlawful for a motor vehicle repair shop to charge more than the written estimate plus $10 or 10 percent, whichever is greater, but not to exceed $50, unless the motor vehicle repair shop has obtained authorization from the customer to exceed the written estimate. See Fla. Stat. § 559.909(3).

44.     Pursuant to the Repair Act, motor vehicle repair shops must provide their customers, upon completion of any repair, with a legible copy of the invoice for the repair. Any such invoice must, among other things, set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof", and the "current date and odometer reading of the motor vehicle". See Fla. Stat. § 559.911(3).

45.     Motor vehicle repair shops that violate the Repair Act are not entitled to receive payment for repair work, including Glass Services, even if the repair work otherwise was legitimately and actually performed.

**II.     The Defendants' Fraudulent and Unlawful Scheme**

46.     Beginning in 2016, and continuing through the present day, Defendants have masterminded and implemented a complex fraudulent scheme in which they billed GEICO and other Florida automobile insurers hundreds of thousands of dollars through Shazam Glass for illusory, unnecessary, fraudulent, unlawful, and otherwise non-reimbursable Glass Services.

**A.     The Unlawful Subcontracting of Glass Services to Independent Contractors, and Misrepresentations that Shazam Glass Provided the Glass Services**

47.     At all relevant times, Shazam Glass was registered as a motor vehicle repair shop with the Florida Department of Agriculture and Consumer Services.

48.     However, from the inception of the Defendants' scheme in 2016, to the present, Shazam Glass did not maintain any vehicles or tools for use in providing Glass Services, did not

11

maintain any glass inventory, and did not provide any actual Glass Services to GEICO Insureds in the first instance.

49.     For example, during a January 10, 2019 deposition, Martineau testified that Shazam Glass did not own or lease any vehicles, did not own or lease any windshield repair or replacement tools, and did not maintain any glass inventory.

50.     Instead, the Defendants engaged independent contractors to act as "sales representatives". These independent contractors/"sales representatives" then would go door-to-door in residential neighborhoods, or lurk in retail store parking lots, to solicit Insureds to receive Glass Services, using fraudulent, deceptive, unfair, unscrupulous, and unlawful means as set forth herein.

51.     After identifying potential customers _via_ these independent contractor "sales representatives", the Defendants then engaged other independent contractors to act as "installers" and to purport to perform Glass Services for the Insureds.

52.     For example, during depositions on January 4, 2019 and January 10, 2019, Martineau gave testimony indicating that none of the individuals who performed the Glass Services that were billed through Shazam Glass to GEICO actually were employees of Shazam Glass. Rather, Martineau testified that the individuals who performed the Glass Services that were billed through Shazam Glass to GEICO were independent contractors.

53.     In fact, Martineau gave testimony during his January 10, 2019 deposition that indicated that the independent contractors who performed the Glass Services billed through Shazam Glass to GEICO were not supervised in any way by Shazam Glass, did not have to meet any quality or performance standards, provided their own tools and equipment in connection with the Glass Services, had to pay for any incentives they provided to the Insureds out of their

own pockets, and were required to compensate customers for any defects in their work out of their own pockets.

54. By electing to treat the "installers" and "sales representatives" as independent contractors, the Defendants realized significant economic benefits – for instance:

    (i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

    (ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

    (iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

    (iv)    avoiding payment of workers' compensation insurance;

    (v)    avoiding claims of agency-based liability arising from work performed by the individuals.

55. Upon information and belief, none of the independent contractors who performed the Glass Services that were billed through Shazam Glass to GEICO actually were registered with the Florida Department of Agriculture and Consumer Services as motor vehicle repair shops.

56. For example, during his January 10, 2019 deposition, Martineau gave testimony indicating that he did not check to see whether the independent contractors who performed the Glass Services that were billed through Shazam Glass to GEICO were themselves registered as motor vehicle repair shops.

57. As set forth above, the Repair Act provides – among other things – that it is unlawful for any motor vehicle repair shop or any motor vehicle repair shop employee to "[h]ave repair work subcontracted without the knowledge or consent of the customer unless the motor

vehicle repair shop or employee thereof demonstrates that the customer could not reasonably have been notified."

58.     In the claims for Glass Services that are identified in Exhibit "1", none of the purported Glass Services actually were performed by Shazam Glass or its employees. Rather, all of the purported Glass Services in the claims identified in Exhibit "1" were performed – to the extent that they were performed at all – by independent contractors to whom the Defendants unlawfully subcontracted the putative repair work without notice to the Insureds.

59.     In the claims for Glass Services that are identified in Exhibit "1", none of the Insureds knew, or consented to, the fact that the Defendants subcontracted the putative repair work to independent contractors. To the contrary, to the extent that the Defendants or the independent contractor "sales representatives" and "installers" provided the Insureds, or GEICO, with any documentation at all regarding the purported Glass Services, the documentation falsely represented that the Glass Services would be performed, or had been performed, by Shazam Glass.

60.     In the claims for Glass Services that are identified in Exhibit "1", each of the Insureds reasonably could have been notified that the Defendants were subcontracting the purported Glass Services to independent contractor "installers". For example, the Defendants had numerous opportunities to convey this information to each of the Insureds in the claims identified in Exhibit "1", including at the times when the independent contractor "sales representatives" first solicited or purported to solicit the Insureds, and at the times when the independent contractor "installers" purported to perform the Glass Services on the Insureds' vehicles.

61.     In the claims for Glass Services that are identified in Exhibit "1", the Defendants

fraudulently billed for the purported Glass Services as if they had been performed by Shazam

Glass or its employees in order to conceal the fact that they had unlawfully subcontracted the

purported Glass Services to independent contractors, without notice to the Insureds or to GEICO,

in violation of the Repair Act.

62.     For example:

(i)     On or about June 12, 2016, the Defendants billed GEICO for Glass
Services that Shazam Glass purportedly provided to an Insured named NH
(all names of Insureds have been redacted to their initials). In their bill for
the Glass Services, the Defendants falsely represented that the Glass
Services actually had been performed by Shazam Glass or its employees.
In fact, to the extent that the Glass Services were performed in the first
instance, they were performed by an independent contractor to whom
Shazam Glass unlawfully subcontracted the repair work, without the
knowledge or consent of NH, despite the fact that the Defendants
reasonably could have notified NH of their intention to subcontract the
Glass Services.

(ii)    On or about June 20, 2016, the Defendants billed GEICO for Glass
Services that Shazam Glass purportedly provided to an Insured named NS.
In their bill for the Glass Services, the Defendants falsely represented that
the Glass Services actually had been performed by Shazam Glass or its
employees. In fact, to the extent that the Glass Services were performed in
the first instance, they were performed by an independent contractor to
whom Shazam Glass unlawfully subcontracted the repair work, without
the knowledge or consent of NS, despite the fact that the Defendants
reasonably could have notified NS of their intention to subcontract the
Glass Services.

(iii)   On or about July 7, 2016, the Defendants billed GEICO for Glass Services
that Shazam Glass purportedly provided to an Insured named AL. In their
bill for the Glass Services, the Defendants falsely represented that the
Glass Services actually had been performed by Shazam Glass or its
employees. In fact, to the extent that the Glass Services were performed in
the first instance, they were performed by an independent contractor to
whom Shazam Glass unlawfully subcontracted the repair work, without
the knowledge or consent of AL, despite the fact that the Defendants
reasonably could have notified AL of their intention to subcontract the
Glass Services.

(iv)     On or about September 27, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named NQ. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of NQ, despite the fact that the Defendants reasonably could have notified NQ of their intention to subcontract the Glass Services.

(v)      On or about November 17, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named PH. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of PH, despite the fact that the Defendants reasonably could have notified PH of their intention to subcontract the Glass Services.

(vi)     On or about February 20, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named KA. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of KA, despite the fact that the Defendants reasonably could have notified KA of their intention to subcontract the Glass Services.

(vii)    On or about March 4, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named RR. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of RR, despite the fact that the Defendants reasonably could have notified RR of their intention to subcontract the Glass Services.

(viii)   On or about March 28, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named

DA. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of DA, despite the fact that the Defendants reasonably could have notified DA of their intention to subcontract the Glass Services.

(ix)     On or about May 9, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named MK. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of MK, despite the fact that the Defendants reasonably could have notified MK of their intention to subcontract the Glass Services.

(x)      On or about May 16, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named ND. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of ND, despite the fact that the Defendants reasonably could have notified ND of their intention to subcontract the Glass Services.

(xi)     On or about August 23, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named LS. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of LS, despite the fact that the Defendants reasonably could have notified LS of their intention to subcontract the Glass Services.

(xii)    On or about February 8, 2018, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named DH. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or

its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of DH, despite the fact that the Defendants reasonably could have notified DH of their intention to subcontract the Glass Services.

(xiii)   On or about February 21, 2018, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named MS. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of MS, despite the fact that the Defendants reasonably could have notified MS of their intention to subcontract the Glass Services.

(xiv)   On or about March 1, 2018, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named MA. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of MA, despite the fact that the Defendants reasonably could have notified MA of their intention to subcontract the Glass Services.

(xv)    On or about November 7, 2018, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named MB. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of MB, despite the fact that the Defendants reasonably could have notified MB of their intention to subcontract the Glass Services.

(xvi)   On or about December 20, 2018, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named CB. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to

whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of CB, despite the fact that the Defendants reasonably could have notified CB of their intention to subcontract the Glass Services.

(xvii)   On or about January 17, 2019, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named DW. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of DW, despite the fact that the Defendants reasonably could have notified DW of their intention to subcontract the Glass Services.

(xviii)   On or about January 17, 2019, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named DP. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of DP, despite the fact that the Defendants reasonably could have notified DP of their intention to subcontract the Glass Services.

(xix)   On or about February 7, 2019, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named KC. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of KC, despite the fact that the Defendants reasonably could have notified KC of their intention to subcontract the Glass Services.

(xx)   On or about February 7, 2019, the Defendants billed GEICO for Glass Services that Shazam Glass purportedly provided to an Insured named JN. In their bill for the Glass Services, the Defendants falsely represented that the Glass Services actually had been performed by Shazam Glass or its employees. In fact, to the extent that the Glass Services were performed in the first instance, they were performed by an independent contractor to whom Shazam Glass unlawfully subcontracted the repair work, without the knowledge or consent of JN, despite the fact that the Defendants

reasonably could have notified JN of their intention to subcontract the Glass Services.

63.     These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Defendants always unlawfully subcontracted the repair work, without the knowledge or consent of the Insureds, despite the fact that the Defendants reasonably could have notified the Insureds of their intention to subcontract the Glass Services.

64.     In each of the claims for Glass Services identified in Exhibit "1", the Defendants falsely represented that Shazam Glass was operating in compliance with the Repair Act and was eligible to collect comprehensive insurance benefits in the first instance. In fact, Shazam Glass never was operating in compliance with the Repair Act, and never was entitled to collect comprehensive insurance benefits, because the Defendants unlawfully subcontracted the pertinent repair work to independent contractors without notice to the Insureds, and then falsely represented to GEICO and to the Insureds that the Glass Services actually had been performed by Shazam Glass or its employees.

65.     In each of the claims for Glass Services that are identified in Exhibit "1", the Defendants also falsely represented that Shazam Glass had valid assignments of comprehensive insurance benefits from the pertinent Insureds. In fact, Shazam Glass never had valid assignments of benefits from the pertinent Insureds, because every purported "assignment" falsely represented that the Insured had assigned his or her right to comprehensive insurance benefits to Shazam Glass "in consideration for the glass repairs performed by" Shazam Glass. However, and as set forth herein, Shazam Glass never actually provided any Glass Services to the Insureds.

66.     What is more, upon information and belief as set forth above, the independent contractors to whom the Defendants unlawfully subcontracted the Glass Services were not

themselves registered as motor vehicle repair shops with the Florida Department of Agriculture and Consumer Services, a further violation of the Repair Act that likewise divested Shazam Glass of any right to collect comprehensive insurance benefits in connection with the Glass Services claims.

**B.     The Defendants' Failure to Comply with the Written Estimate Provisions of the Repair Act**

67.     Additionally, in the claims for Glass Services that are identified in Exhibit "1", the Defendants never complied with the written estimate provisions of the Repair Act.

68.     In particular, and as set forth above, if the cost of the proposed Glass Services will exceed $100.00, the Repair Act requires motor vehicle repair shops to present a written notice to the customer, using specific statutory language, in a separate, blocked section, in capital letters of at least 12-point type, advising the customer of his or her right to a written estimate and giving the customer the ability to elect or decline to receive the estimate. See Fla. Stat. § 559.905(2).

69.     In all of the claims for Glass Services that are identified in Exhibit "1", the cost of the purported Glass Services exceeded $100.00.

70.     However, in the Glass Services claims identified in Exhibit "1", Defendants never provided the requisite written notice to the Insureds in accordance with the Repair Act, using the specific statutory language, in a separate, blocked section, in capital letters of at least 12-point type, advising the customer of their right to a written estimate and giving the customer the ability to elect or decline to receive the estimate.

71.     Rather – to the extent that the Insureds ever received any documents regarding the Glass Services before they were performed – the only documents that the Insureds received were copies of purported work orders that were provided to them by the independent contractor "sales

representatives" whom the Defendants used to solicit the Insureds in their neighborhoods or retail store parking lots.

72.     These work orders did not set forth the written notice required by Fla. Stat. § 559.905(2), in that they did not set forth the specific statutory notice language required by Section 559.905(2), they did not set forth the notice language in capital letters of at least 12-point type, they did not set forth the notice language in a separate, blocked section, and they did not provide the Insureds with the ability to personally check off the box indicating whether they requested or declined a written estimate.

73.     Instead – to the extent that the Insureds in the claims identified in Exhibit "1" received any notice at all of their right to elect or decline a written estimate – the only "notices" that the Insureds received were work orders which stated, in pre-printed language, "I have been advised of my right to a written estimate and waive my right to said estimate."

74.     This purported "waiver" language was not in 12-point type, was not in capital letters, was not set forth in a separate, blocked section of the work orders, and did not provide any space or option for the Insureds to personally check off their preference regarding whether or not they wanted a written estimate.

75.     In fact, this purported "waiver" language was not even located on the portion of the work orders that was right above or right next to the space for the Insureds' signatures. Instead, the Defendants deliberately inserted the purported "waiver" language in a portion of the work orders where it could easily be overlooked by the Insureds when they signed or purportedly signed the work orders.

76.     For example:

(i)     On or about June 12, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named NH,

despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to NH. The Defendants never provided NH with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that NH received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(ii)     On or about June 19, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named LP, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to LP. The Defendants never provided LP with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that LP received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(iii)    On or about July 8, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named RB, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to RB. The Defendants never provided RB with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that RB received any "notice" at all of his right to elect or decline a written estimate, the only "notice" he received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(iv)    On or about July 19, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named JL, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to JL. The Defendants never provided JL with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that JL received any "notice" at all of his right to elect or decline a written estimate, the only "notice" he received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(v)     On or about October 13, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named MP, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to MP. The Defendants never provided MP with the written notice

required by Fla. Stat. § 559.905(2). Instead, to the extent that MP received any "notice" at all of his right to elect or decline a written estimate, the only "notice" he received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(vi)     On or about November 17, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named PH, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to PH. The Defendants never provided PH with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that PH received any "notice" at all of his right to elect or decline a written estimate, the only "notice" he received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(vii)    On or about November 23, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named MS, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to MS. The Defendants never provided MS with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that MS received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(viii)   On or about December 11, 2016, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named MH, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to MH. The Defendants never provided MH with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that MH received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(ix)     On or about January 7, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named SV, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to SV. The Defendants never provided SV with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that SV received any "notice" at all of his right to elect or decline a written estimate, the

only "notice" he received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(x)     On or about January 26, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named DG, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to DG. The Defendants never provided DG with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that DG received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(xi)    On or about January 26, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named EK, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to EK. The Defendants never provided EK with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that EK received any "notice" at all of his right to elect or decline a written estimate, the only "notice" he received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(xii)   On or about January 30, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named PW, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to PW. The Defendants never provided PW with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that PW received any "notice" at all of his right to elect or decline a written estimate, the only "notice" he received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(xiii)  On or about January 30, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named PH, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to PH. The Defendants never provided PH with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that PH received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set

forth above, which did not meet any of the requirements of Section 559.905(2).

(xiv)   On or about February 20, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named KA, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to KA. The Defendants never provided KA with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that KA received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(xv)    On or about February 27, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named JD, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to JD. The Defendants never provided JD with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that JD received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(xvi)   On or about May 16, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named ND, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to ND. The Defendants never provided ND with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that ND received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(xvii)  On or about June 1, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named BP, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to BP. The Defendants never provided BP with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that BP received any "notice" at all of his right to elect or decline a written estimate, the only "notice" he received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(xviii) On or about August 23, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named LS, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to LS. The Defendants never provided LS with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that LS received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(xix) On or about August 23, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named KF, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to KF. The Defendants never provided KF with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that KF received any "notice" at all of her right to elect or decline a written estimate, the only "notice" she received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

(xx) On or about December 21, 2017, the Defendants billed GEICO for Glass Services that Shazam Glass purported to provide to an Insured named DR, despite the fact that – in actuality – the Defendants unlawfully subcontracted the Glass Services to an independent contractor, without notice to DR. The Defendants never provided DR with the written notice required by Fla. Stat. § 559.905(2). Instead, to the extent that DR received any "notice" at all of his right to elect or decline a written estimate, the only "notice" he received was via the pre-printed work order language set forth above, which did not meet any of the requirements of Section 559.905(2).

77.     These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Defendants virtually always unlawfully failed to provide the Insureds with written notice, using the specific statutory language, in a separate, blocked section, in capital letters of at least 12-point type, advising the Insureds of their right to a written estimate and giving the Insureds the ability to elect or decline to receive the estimate.

78.     In each of the claims for Glass Services identified in Exhibit "1", the Defendants falsely represented that Shazam Glass was operating in compliance with the Repair Act and was

eligible to collect comprehensive insurance benefits in the first instance. In fact, Shazam Glass never was operating in compliance with the Repair Act, and never was entitled to collect comprehensive insurance benefits, because the Defendants unlawfully failed to provide the requisite written notice as required by Fla. Stat. § 559.905(2).

**C.    The Defendants' Failure to Comply with the Invoice and Work Order Provisions of the Repair Act**

79.    What is more, in the claims for Glass Services that are identified in Exhibit "1", the Defendants almost never complied with the invoice provisions of the Repair Act.

80.    Specifically, and as set forth above, Fla. Stat. § 559.911 provides that motor vehicle repair shops must provide their customers, upon completion of any repair, with a legible copy of the invoice for the repair. Any such invoice must, among other things, set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof", and the "current date and odometer reading of the motor vehicle".

81.    However, in the claims identified in Exhibit "1", the Defendants virtually always failed – upon the completion of any purported Glass Services – to provide the Insureds with copies of invoices for the repairs that set forth an itemized description of all labor, parts, and merchandise supplied and the costs thereof", and the "current date and odometer reading of the motor vehicle".

82.    To the contrary, in the claims for Glass Services that are identified in Exhibit "1", the Defendants routinely: (i) purported to have the Insureds sign work orders which did not set forth how much Shazam Glass intended to charge for the purported Glass Services, and instead stated, in pre-printed language that did not meet the statutory notice requirements of Fla. Stat. 559.905(2), "I have been advised of my right to a written estimate and waive my right to said estimate"; and then (ii) failed to provide any invoice to the Insureds upon the purported

completion of the Glass Services, thereby preventing the Insureds from ever learning how much the Defendants billed GEICO for the purported Glass Services. The Defendants engaged in these activities in order to conceal the fact that they intended to charge GEICO exorbitant sums for the purported Glass Services that were far in excess of the pricing parameters set forth in the work order received from GEICO, and that they intended to misrepresent the nature and extent of the Glass Services in their insurance claims.

83.     What is more, in a number of the claims for Glass Services that are identified in Exhibit "1", the Defendants forged the Insureds' signatures on the invoices they submitted to GEICO, or caused them to be forged, in order to create the false appearance that the invoices actually had been provided to the Insureds.

84.     For example:

(i)     On or about June 11, 2016, the Defendants purported to provide Glass Services to an Insured named NS, which they then billed through Shazam Glass to GEICO without ever providing NS with a copy of the invoice.

(ii)    On or about August 5, 2016, the Defendants purported to provide Glass Services to an Insured named SH, which they then billed through Shazam Glass to GEICO without ever providing SH with a copy of the invoice.

(iii)   On or about September 19, 2016, the Defendants purported to provide Glass Services to an Insured named JI, which they then billed through Shazam Glass to GEICO without ever providing JI with a copy of the invoice.

(iv)    On or about September 27, 2016, the Defendants purported to provide Glass Services to an Insured named NQ, which they then billed through Shazam Glass to GEICO without ever providing NQ with a copy of the invoice.

(v)     On or about December 10, 2016, the Defendants purported to provide Glass Services to an Insured named RM, which they then billed through Shazam Glass to GEICO without ever providing RM with a copy of the invoice.

(vi)     On or about January 13, 2017, the Defendants purported to provide Glass Services to an Insured named TM, which they then billed through Shazam Glass to GEICO without ever providing TM with a copy of the invoice.

(vii)    On or about March 11, 2017, the Defendants purported to provide Glass Services to an Insured named GS, which they then billed through Shazam Glass to GEICO without ever providing GS with a copy of the invoice.

(viii)   On or about March 15, 2017, the Defendants purported to provide Glass Services to an Insured named AA, which they then billed through Shazam Glass to GEICO. Not only did the Defendants fail to provide AA with a copy of the invoice for the purported Glass Services, but the Defendants caused AA's signature to be forged on the invoice for the Glass Services that they submitted to GEICO, in order to create the false appearance that they actually provided AA with a copy of the invoice.

(ix)     On or about June 24, 2017, the Defendants purported to provide Glass Services to an Insured named KT, which they then billed through Shazam Glass to GEICO. Not only did the Defendants fail to provide KT with a copy of the invoice for the purported Glass Services, but the Defendants caused KT's signature to be forged on the invoice for the Glass Services that they submitted to GEICO, in order to create the false appearance that they actually provided KT with a copy of the invoice.

(x)      On or about June 29, 2017, the Defendants purported to provide Glass Services to an Insured named DH, which they then billed through Shazam Glass to GEICO. Not only did the Defendants fail to provide DH with a copy of the invoice for the purported Glass Services, but the Defendants caused DH's signature to be forged on the invoice for the Glass Services that they submitted to GEICO, in order to create the false appearance that they actually provided DH with a copy of the invoice.

(xi)     On or about July 7, 2017, the Defendants purported to provide Glass Services to an Insured named KS, which they then billed through Shazam Glass to GEICO without ever providing KS with a copy of the invoice.

(xii)    On or about July 20, 2017, the Defendants purported to provide Glass Services to an Insured named SH, which they then billed through Shazam Glass to GEICO. Not only did the Defendants fail to provide SH with a copy of the invoice for the purported Glass Services, but the Defendants caused SH's signature to be forged on the invoice for the Glass Services that they submitted to GEICO, in order to create the false appearance that they actually provided SH with a copy of the invoice.

(xiii)   On or about August 22, 2017, the Defendants purported to provide Glass Services to an Insured named AS, which they then billed through Shazam Glass to GEICO without ever providing AS with a copy of the invoice.

(xiv)   On or about January 26, 2018, the Defendants purported to provide Glass Services to an Insured named JC, which they then billed through Shazam Glass to GEICO without ever providing JC with a copy of the invoice.

(xv)   During a January 4, 2019 deposition, Martineau testified that an Insured named BN was never shown any pricing information for the Defendants' purported Glass Services, and would not have received a copy of the invoice for the purported Glass Services "unless he requested a copy".

85.     These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Defendants routinely and unlawfully failed to provide the Insureds, upon completion of the purported Glass Services, with a legible copy of the invoice for the repair which set forth an "itemized description of all labor, parts, and merchandise supplied and the costs thereof".

86.     Moreover, in the claims identified in Exhibit "1", even in the limited instances when the Defendants actually provided the Insureds with invoices for their purported Glass Services, the invoices virtually always failed to set forth the odometer reading of the pertinent vehicles.

87.     To the contrary, in the claims that are identified in Exhibit "1", almost none of the Defendants' invoices set forth the odometer readings for the pertinent vehicles.

88.     Furthermore, in the claims for Glass Services that are identified in Exhibit "1", the Defendants routinely and unlawfully caused or permitted the Insureds to sign work orders that did not state the automobiles' odometer readings at the time of the purported repairs.

89.     For example:

(i)   On or about June 9, 2016, the Defendants purported to provide Glass Services to an Insured named LP. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted LP to sign a work

order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide LP with an invoice that set forth the odometer reading of the vehicle.

(ii)     On or about June 10, 2016, the Defendants purported to provide Glass Services to an Insured named EK. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted EK to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide EK with an invoice that set forth the odometer reading of the vehicle.

(iii)    On or about July 2, 2016, the Defendants purported to provide Glass Services to an Insured named AL. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted AL to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide AL with an invoice that set forth the odometer reading of the vehicle.

(iv)     On or about September 27, 2016, the Defendants purported to provide Glass Services to an Insured named MP. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted MP to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide MP with an invoice that set forth the odometer reading of the vehicle.

(v)      On or about October 28, 2016, the Defendants purported to provide Glass Services to an Insured named JC. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted JC to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide JC with an invoice that set forth the odometer reading of the vehicle.

(vi)     On or about December 3, 2016, the Defendants purported to provide Glass Services to an Insured named MH. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted MH to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide MH with an invoice that set forth the odometer reading of the vehicle.

(vii)    On or about January 28, 2017, the Defendants purported to provide Glass Services to an Insured named PH. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted PH to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide PH with an invoice that set forth the odometer reading of the vehicle.

(viii)   On or about February 11, 2017, the Defendants purported to provide Glass Services to an Insured named JD. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted JD to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide JD with an invoice that set forth the odometer reading of the vehicle.

(ix)   On or about March 23, 2017, the Defendants purported to provide Glass Services to an Insured named DA. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted DA to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide DA with an invoice that set forth the odometer reading of the vehicle.

(x)   On or about April 13, 2017, the Defendants purported to provide Glass Services to an Insured named EH. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted EH to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide EH with an invoice that set forth the odometer reading of the vehicle.

(xi)   On or about May 10, 2017, the Defendants purported to provide Glass Services to an Insured named ND. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted ND to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide ND with an invoice that set forth the odometer reading of the vehicle.

(xii)   On or about August 16, 2017, the Defendants purported to provide Glass Services to an Insured named LS. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted LS to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide LS with an invoice that set forth the odometer reading of the vehicle.

(xiii)   On or about December 13, 2017, the Defendants purported to provide Glass Services to an Insured named DR. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted DR to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide DR with an invoice that set forth the odometer reading of the vehicle.

(xiv)   On or about June 22, 2018, the Defendants purported to provide Glass Services to an Insured named NB. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted NB to sign a work order that failed to set forth the odometer reading of the vehicle, and

unlawfully failed to provide NB with an invoice that set forth the odometer reading of the vehicle.

(xv)    On or about August 31, 2018, the Defendants purported to provide Glass Services to an Insured named BD. In connection with the purported Glass Services, the Defendants unlawfully caused or permitted BD to sign a work order that failed to set forth the odometer reading of the vehicle, and unlawfully failed to provide BD with an invoice that set forth the odometer reading of the vehicle.

90.    These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Defendants routinely and unlawfully: (i) failed to provide the Insureds with copies of invoices that set forth the odometer readings of the vehicles; and (ii) caused or permitted the Insureds to sign work orders that failed to set forth the odometer readings of the vehicles.

91.    In each of the claims for Glass Services identified in Exhibit "1", the Defendants falsely represented that Shazam Glass was operating in compliance with the Repair Act and was eligible to collect comprehensive insurance benefits in the first instance. In fact, Shazam Glass never was operating in compliance with the Repair Act, and never was entitled to collect comprehensive insurance benefits, because the Defendants: (i) failed to provide the Insureds with copies of invoices that set forth the odometer readings of the vehicles; and (ii) caused or permitted the Insureds to sign work orders that failed to set forth the odometer readings of the vehicles.

**D.    Defendants' Falsification of "Loss Dates" in Their Claims for Glass Services**

92.    In the context of a claim for Glass Services, the date on which an Insured sustains damage to his or her windshield is known as the "loss date" or "date of loss".

93.    In the context of a claim for Glass Services, the date of loss is important, because if an Insured does not have comprehensive insurance coverage on the date when the Insured

34

sustains damage to his or her windshield, the automobile insurance company will have no obligation to pay the Glass Services claim.

94.     The Defendants were aware of the fact that dates of loss are important in the context of claims for Glass Services, and purported to include the dates of each Insured's purported loss in the invoices they submitted or caused to be submitted to GEICO in support of their claims for Glass Services.

95.     In many cases, however, when the Defendants' independent contractor "sales representatives" solicited Insureds in their neighborhoods or in retail store parking lots, the Defendants learned that the Insureds did not have comprehensive insurance coverage, or that the damage to the Insureds' windshields pre-dated or post-dated the period when the Insureds did have comprehensive insurance coverage.

96.     In such instances, the Defendants either: (i) would cause the Insureds to apply for comprehensive insurance coverage, and then falsify the dates of loss in their claims for Glass Services to make it appear as if the losses occurred after the Insureds had obtained comprehensive insurance coverage; or (ii) if the Insureds had comprehensive insurance coverage at some other point in time, would falsify the dates of loss in their claims for Glass Services to make it appear as if the losses occurred during a period when the Insureds did have comprehensive insurance coverage.

97.     For example:

> (i)     On or about July 2, 2016, the Defendants purported to provide Glass Services to an Insured named AL. After ascertaining that AL did not have comprehensive insurance coverage from GEICO in July 2016, but that AL did have comprehensive insurance coverage from GEICO in August 2012, the Defendants submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was August 1, 2012. In fact, neither the Defendants, nor AL himself, had any idea when the actual loss occurred.

35

(ii)   On or about August 5, 2016, the Defendants purported to provide Glass Services to an Insured named SH. After ascertaining that SH did not have comprehensive insurance coverage from GEICO in 2016, but that SH did have comprehensive insurance coverage from GEICO in April 2014, the Defendants submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was April 3, 2014. In fact, the actual date of loss was in or around May 2016, when SH did not have comprehensive insurance coverage from GEICO.

(iii)  On or about December 1, 2016, the Defendants purported to provide Glass Services to an Insured named TB. After ascertaining that TB did not have comprehensive insurance coverage from GEICO in December 2016, but that TB did have comprehensive insurance coverage from GEICO in early June 2016, the Defendants submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was June 3, 2016. In actuality, TB had not sustained any actual damage to her windshield in the first instance, and did not require any windshield replacement services.

(iv)   On or about December 14, 2016, the Defendants purported to provide Glass Services to an Insured named MA. After ascertaining that MA did not have comprehensive insurance coverage from GEICO in December 2016, but that MA did have comprehensive insurance coverage from GEICO in July 2009, the Defendants submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was July 1, 2009. In fact, neither the Defendants, nor MA himself, had any idea when the actual loss occurred.

(v)    On or about December 15, 2016, the Defendants purported to provide Glass Services to an Insured named JB. After ascertaining that JB did not have comprehensive insurance coverage from GEICO in December 2016, but that JB did have comprehensive insurance coverage from GEICO in February 2011, the Defendants submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was February 4, 2011. In fact, neither the Defendants, nor JB himself, had any idea when the actual loss occurred.

(vi)   On or about December 15, 2016, the Defendants purported to provide Glass Services to an Insured named RB. The actual date of loss was September 2, 2016. After ascertaining that RB did not have comprehensive insurance coverage from GEICO on September 2, 2016, but that RB did have comprehensive insurance coverage from GEICO on December 14, 2016, the Defendants submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was December 14, 2016.

(vii)    On or about December 22, 2016, the Defendants purported to provide Glass Services to an Insured named SH. After ascertaining that SH did not have comprehensive insurance coverage from GEICO in December 2016, but that SH did have comprehensive insurance coverage from GEICO in mid-May 2016, the Defendants submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was May 16, 2016. In fact, the actual date of loss was in or around November 2016, when SH did not have comprehensive insurance coverage from GEICO.

(viii)    On or about February 24, 2017, the Defendants purported to provide Glass Services to an Insured named MB. After ascertaining that MB did not have comprehensive insurance coverage from GEICO in February 2017, but that MB did have comprehensive insurance coverage from GEICO in September 2015, the Defendants submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was September 20, 2015. In fact, neither the Defendants, nor MB himself, had any idea when the purported loss occurred, and MB was not even certain whether he has sustained any damage to his windshield in the first instance.

(ix)    On or about June 27, 2017, the Defendants caused an Insured named KS to be solicited by one of their independent contractor "sales representatives", who purported to identify existing damage to KS's windshield. After ascertaining during the solicitation that KS did not have comprehensive insurance coverage from GEICO, the Defendants had KS obtain comprehensive insurance coverage effective on June 28, 2017. Then, on or about July 7, 2017, the Defendants purported to provide Glass Services to KS, and then submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was June 30, 2017, shortly after KS' comprehensive insurance coverage came into effect. In fact, the actual date of loss was prior to June 28, 2017, when KS first obtained comprehensive insurance coverage pursuant to the Defendants' instructions.

(x)    On or about July 25, 2017, the Defendants caused an Insured named EF to be solicited by one of their independent contractor "sales representatives", who purported to identify existing damage to EF's windshield. After ascertaining during the solicitation that EF did not have comprehensive insurance coverage from GEICO, the Defendants had EF obtain comprehensive insurance coverage effective on June 26, 2017. Then, on or about June 26, 2017, the Defendants purported to provide Glass Services to EF, and then submitted a claim for the purported Glass Services to GEICO which falsely represented that the date of loss was June 26, 2017, the same day when EF' comprehensive insurance coverage came into

effect. In fact, the actual date of loss was prior to June 26, 2017, when EF first obtained comprehensive insurance coverage pursuant to the Defendants' instructions.

98.    These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Defendants routinely either: (i) would cause the Insureds to apply for comprehensive insurance coverage, and then falsify the dates of loss in their claims for Glass Services to make it appear as if the losses occurred after the Insureds had obtained comprehensive insurance coverage; or (ii) if the Insureds had comprehensive insurance coverage at some other point in time, would falsify the dates of loss in their claims for Glass Services to make it appear as if the losses occurred during a period when the Insureds did have comprehensive insurance coverage.

99.    In each of the claims for Glass Services identified in Exhibit "1", the Defendants falsely represented that Shazam Glass was operating in compliance with the Repair Act and was eligible to collect comprehensive insurance benefits in the first instance. In fact, Shazam Glass never was operating in compliance with the Repair Act, and never was entitled to collect comprehensive insurance benefits, because the Defendants routinely and fraudulently falsified the dates of loss in their claims for Glass Services, to make it appear as if the Insureds had comprehensive insurance coverage at the time of the losses, when in fact they did not.

E.    **The Forgeries of Insureds' Signatures on Glass Services Claim Documents**

100.    Not only did the Defendants unlawfully subcontract all of their purported Glass Services to independent contractors without notice to the Insureds, falsely represent that the Glass Services had actually been performed by Shazam Glass or its employees, fail to comply with the written estimate provisions of the Repair Act, fail to comply with the invoice and work order provisions of the Repair Act, and routinely falsify the loss dates in their Glass Services

38

claims, but the Defendants also routinely and unlawfully forged Insureds' signatures on documents they submitted to GEICO in support of their Glass Services claims.

101.   For instance, in order to create the false appearance that Insureds had authorized the performance of the purported Glass Services, assigned their comprehensive insurance benefits to Shazam Glass, had waived their right to written estimates, and had received itemized copies of the invoices for the purported Glass Services, the Defendants routinely forged Insureds' signatures on work orders, assignments of benefits, and invoices, or caused the Insureds' signatures to be forged on the documents.

102.   For example:

(i)   On or about June 10, 2016, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named NS to receive Glass Services. However, NS declined the offer of Glass Services, because there was nothing wrong with the windshield on her vehicle. The Defendants never provided any Glass Services with respect to NS's vehicle. Even so, on or about June 20, 2016, the Defendants submitted a claim to GEICO for Glass Services that they purportedly performed on NS's vehicle. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged NS's signature. In actuality, NS never signed any documents related to the purported Glass Services.

(ii)   On or about August 5, 2016, the Defendants purported to provide Glass Services to an Insured named SH, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged SH's signature. In actuality, SH never signed the work order or assignment of benefits related to the purported Glass Services.

(iii)   On or about September 1, 2016, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named NQ to receive Glass Services. Thereafter, on or about September 27, 2016, the Defendants purported to provide Glass Services to NQ, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged NQ's

signature. In actuality, NQ never signed any documents related to the purported Glass Services.

(iv)     On or about September 19, 2016, the Defendants purported to provide Glass Services to an Insured named JI, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged JI's signature. In actuality, JI never signed the work order or assignment of benefits related to the purported Glass Services.

(v)      On or about November 9, 2016, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named RM to receive Glass Services. Pursuant to the Defendants' instructions, the "sales representative" falsely represented to RM that there would be no cost for the Glass Services. Thereafter, on or about December 10, 2016, the Defendants purported to provide Glass Services to RM, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Defendants submitted an invoice and assignment of comprehensive insurance benefits to GEICO on which they forged RM's signature. In actuality, RM never signed any invoice or assignment of benefits related to the purported Glass Services.

(vi)     On or about December 14, 2016, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named RB to receive Glass Services. Pursuant to the Defendants' instructions, the "sales representative" falsely represented to RB that there would be no cost for the Glass Services. Thereafter, on or about December 15, 2016, the Defendants purported to provide Glass Services to RB, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged RB's signature. In actuality, RB never signed any documents related to the purported Glass Services.

(vii)    On or about January 13, 2017, the Defendants purported to provide Glass Services to an Insured named TM, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged TM's signature. In actuality, TM never signed the work order or assignment of benefits related to the purported Glass Services.

(viii)   On or about March 10, 2017, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named GS to receive Glass Services. Thereafter, on or about March 11, 2017, the

Defendants purported to provide Glass Services to GS, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged GS's signature. In actuality, GS never signed the work order or assignment of benefits related to the purported Glass Services.

(ix)  On or about June 24, 2017, the Defendants purported to provide Glass Services to an Insured named KT, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged KT's signature. In actuality, KT never signed the work order or assignment of benefits related to the purported Glass Services.

(x)  On or about July 20, 2017, the Defendants purported to provide Glass Services to an Insured named SH, and then submitted a claim to GEICO for the purported Glass Services. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged SH's signature. In actuality, SH never signed the work order or assignment of benefits related to the purported Glass Services. In fact, SH did not even own the vehicle at the time when the Defendants purported to perform the Glass Services on the vehicle.

103.    These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Defendants routinely forged Insureds' signatures on work orders, assignments of benefits, and invoices, or caused the Insureds' signatures to be forged on the documents, in order to create the false appearance that the Insureds had authorized the performance of the purported Glass Services, assigned their comprehensive insurance benefits to Shazam Glass, had waived their right to written estimates, and had received itemized copies of the invoices for the purported Glass Services.

104.    In each of the claims for Glass Services identified in Exhibit "1", the Defendants falsely represented that Shazam Glass was operating in compliance with the Repair Act and was eligible to collect comprehensive insurance benefits in the first instance. In fact, Shazam Glass never was operating in compliance with the Repair Act, and never was entitled to collect

41

comprehensive insurance benefits, because the Defendants: (i) made or charged for repairs that had not been authorized by their purported customers; (ii) fraudulently altered documents in support of the claims; (iii) made or authorized untrue, deceptive or misleading statements in support of the claims; and (iv) and engaged in pervasive fraud and misrepresentation in connection with the claims.

**F.     The Defendants' False Promises and Charges for Unnecessary or Illusory Glass Services**

105.    What is more, in the claims that are identified in Exhibit "1", the Defendants routinely and unlawfully billed GEICO for unnecessary or illusory Glass Services, often after inducing the Insureds to authorize the unnecessary Glass Services through false promises or threats of harm to the Insureds' vehicles if the Glass Services were not performed.

106.    For example:

(i)     On or about June 10, 2016, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named NS to receive Glass Services. However, NS declined the offer of Glass Services, because there was nothing wrong with the windshield on her vehicle. The Defendants never provided any Glass Services with respect to NS's vehicle. Even so, on or about June 20, 2016, the Defendants submitted a claim to GEICO for Glass Services that they purportedly performed on NS's vehicle. In support of the claim, the Defendants submitted a work order and assignment of comprehensive insurance benefits to GEICO on which they forged NS's signature. In actuality, NS never signed any documents related to the purported Glass Services.

(ii)    On or about September 1, 2016, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named NQ to receive Glass Services. To induce NQ to agree to the Glass Services, the Defendants' "sales representative", at the Defendants' direction, falsely promised that NQ would receive a free cruise voucher if she permitted the Glass Services. Though the Defendants purported to perform the Glass Services on or about September 27, 2016, and billed the purported Glass Services to GEICO, the Defendants never provided NQ with the cruise voucher.

(iii)   On or about September 28, 2016, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named CC to receive Glass Services. To induce CC to authorize the performance of the Glass Services, the Defendants' "sales representative", at the Defendants' direction, falsely informed CC that no claim would be made on his comprehensive insurance policy, and instead offered to perform the Glass Services for $50.00, to be paid to Shazam Glass directly by CC. In reliance on these representations, CC authorized the Glass Services and paid Shazam Glass $50.00 for the Glass Services. Then, after inducing CC to authorize the Glass Services with a promise that no claim would be made on his insurance policy, the Defendants billed GEICO for the Glass Services, without CC's knowledge or consent.

(iv)   On or about November 30, 2016, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named TB to receive Glass Services. TB initially refused the Defendants' offer, because her windshield did not appear to be damaged in any way. Even so, after the Defendants' "sales representative", at the Defendants' direction, falsely claimed that TB's windshield was "separating" from its frame, and offered TB gift cards if she would authorize the Glass Services, TB authorized the Glass Services, which the Defendants then billed to GEICO.

(v)   In December 2016, the Defendants caused one of their independent contractor "sales representatives" to solicit an Insured named TP to receive Glass Services. Though TP initially refused Defendants' offer of Glass Services because there was no genuine damage to his windshield, he eventually agreed to authorize the performance of the Glass Services after the Defendants' "sales representative", at the Defendants' direction, offered TP a $100.00 gift card from Target if he would authorize the performance of the unnecessary Glass Services, and falsely advised TP that the seal on the windshield was coming loose, and that windshields need to be replaced every two years. Though the Defendants purported to perform the Glass Services on December 28, 2016, and billed the purported Glass Services to GEICO, the Defendants never provided TP with the $100.00 gift card.

(vi)   On or about January 19, 2017, an Insured named DA had the windshield replaced in his vehicle by a company other than Shazam Glass. Thereafter, DA noticed that the new windshield did not have a tint strip on the top portion of the glass. DA therefore contacted the first windshield replacement company, which stated that it would return and install the tint strip. Then, on or about March 2, 2017, the Defendants sent one of their independent contractor "sales representatives" to solicit individuals in DA's neighborhood. When the "sales representative" knocked on DA's door, DA's wife, who did not speak English, believed that the first

43

windshield repair company had arrived to install the tint strip, and gave Defendants "sales representative" the keys to DA's vehicle. Though DA never authorized the Defendants to perform any Glass Services, and though there was no damage whatsoever to DA's recently-replaced, brand-new windshield, the Defendants directed one of their independent contractor "installers" perform an unnecessary replacement of DA's windshield, without authorization, and then billed the unnecessary Glass Services to GEICO.

(vii)   On or about February 10, 2017, the Defendants purported to provide Glass Services to an Insured named IB. The Defendants then billed GEICO for – among other things – 3.3 hours of labor in connection with the purported Glass Services, via an invoice which falsely represented that the putative Glass Services required 3.3 hours to perform. In fact, the purported Glass Services did not involve more than one hour of labor, and were performed by a subcontractor without notice to IB.

(viii)  On or about March 11, 2017, the Defendants purported to provide Glass Services to an Insured named GS. The Defendants then billed GEICO for – among other things – three hours of labor in connection with the purported Glass Services, via an invoice which falsely represented that the putative Glass Services required three hours to perform. In fact, the purported Glass Services did not involve more than one hour of labor, and were performed by a subcontractor without notice to GS.

(ix)    On or about June 30, 2017, the Defendants purported to provide unnecessary Glass Services to an Insured named AS, after inducing AS to permit the Glass Services through false claims by their independent contractor "sales representative", on or about June 29, 2017, at the Defendants' direction, that the seal on AS' windshield was loose and could cause the windshield to fly off. The Defendants then billed GEICO for – among other things – four hours of labor in connection with the purported Glass Services, via an invoice which falsely represented that the putative Glass Services required three hours to perform. In fact, the purported Glass Services did not involve more than 30 minutes of labor, and were performed by a subcontractor without notice to AS.

(x)     On or about July 20, 2017, the Defendants purported to provide Glass Services to an Insured named SH. The Defendants then billed GEICO for the purported Glass Services. In fact, the Defendants never provided any Glass Services to SH, and she did not even own the pertinent vehicle at the time when the Glass Services purportedly were performed.

(xi)    On or about January 26, 2018, the Defendants purported to provide Glass Services to an Insured named JC. The Defendants then billed GEICO for – among other things – three hours of labor in connection with the purported

Glass Services, via an invoice which falsely represented that the putative Glass Services required three hours to perform. In fact, the purported Glass Services did not involve more than one hour of labor, and were performed by a subcontractor without notice to JC.

(xii)   On or about April 27, 2018, the Defendants purported to provide Glass Services to an Insured named AM. The Defendants then billed GEICO for – among other things – 3.4 hours of labor in connection with the purported Glass Services, via an invoice which falsely represented that the putative Glass Services required 3.4 hours to perform. In fact, the purported Glass Services did not involve more than one and a half hours of labor, and were performed by a subcontractor without notice to AM.

107.   These are only representative examples. In the claims for Glass Services that are identified in Exhibit "1", the Defendants routinely and unlawfully billed GEICO for unnecessary or illusory Glass Services, often after inducing the Insureds to authorize the unnecessary Glass Services through false promises or threats of harm to the Insureds' vehicles if the Glass Services were not performed.

108.   In each of the claims for Glass Services identified in Exhibit "1", the Defendants falsely represented that Shazam Glass was operating in compliance with the Repair Act and was eligible to collect comprehensive insurance benefits in the first instance. In fact, Shazam Glass never was operating in compliance with the Repair Act, and never was entitled to collect comprehensive insurance benefits, because the Defendants routinely and unlawfully billed GEICO for unnecessary or illusory Glass Services, often after inducing the Insureds to authorize the unnecessary Glass Services through false promises or threats of harm to the Insureds' vehicles if the Glass Services were not performed.

**G.    The Defendants' Exploitation of Florida Insurance Claims Handling Requirements to Conceal and Perpetuate the Scheme**

109.   As set forth above, in a legitimate claim for Glass Services, Insureds typically provide a notice of their loss to GEICO, and – as part of that process – provide GEICO with the

name of their preferred glass repair or replacement shop. GEICO then sends a work order to the preferred shop, and the preferred shop then submits a claim to GEICO with the work order number when the work is complete.

110.    This notice of loss process plays an important role in ensuring that the windshield repair and replacement claims that GEICO receives are legitimate. Among other things, it ensures that the windshield repair and replacement shops actually have received legitimate assignments of benefits from GEICO Insureds. It also ensures that the Insureds are aware of the fact that the glass repair and replacement shops have purported to perform work on the Insureds' windshields, and have submitted claims for reimbursement under the Insureds' comprehensive insurance policies.

111.    In order to conceal and perpetuate the Defendants' scheme, the Defendants almost never followed the ordinary notice of loss process.

112.    The Defendants almost never followed the ordinary notice of loss process because – if they had – GEICO would have contacted the Insureds to, among other things, verify the claims and identify the Insureds' preferred glass repair or replacement shops.

113.    The Insureds then would be on notice of the fact that the the Defendants were falsely purporting to have assignments of benefits from the Insureds, and were falsely claiming to have performed Glass Services for the Insureds. By extension, the Insureds would be likely to advise GEICO that the Defendants were engaged in fraud.

114.    Instead, to conceal and perpetuate their scheme, the Defendants submitted virtually of their claims for Glass Services to GEICO <u>after</u> they had purported to provide the pertinent Glass Services.

115.     As set forth above, the Defendants knew that – upon receipt of an invoice for windshield repair or replacement services provided to an Insured with comprehensive insurance coverage – Florida law generally permits insurers such as GEICO only 30 days to handle the claim. See, e.g., Fla. Stat. § 626.9541.

116.     The Defendants also knew that, if insurers such as GEICO do not pay a claim within 30 days, or present some good reason for denying or investigating the claim, they can be liable to the Insured or the Insured's assignee for damages, as well as attorneys' fees, under the Florida Unfair Insurance Trade Practices Act. See id.; see also Fla. Stat. § 624.155.

117.     In this context, the Defendants submitted virtually of their claims for Glass Services to GEICO after they had falsely purported to provide the pertinent Glass Services because they knew that: (i) this time-frame severely limited GEICO's ability to verify the claims; and (ii) forced GEICO to rely on the claims or else face the prospect of suits for damages and attorneys' fees under the Florida Unfair Insurance Trade Practices Act.

III.     **The Fraudulent and Unlawful Claims the Defendants Submitted or Caused to be Submitted to GEICO**

118.     To support the fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of fraudulent and unlawful claims to GEICO through Shazam Glass seeking payment for Glass Services for which the Defendants were not entitled to receive payment.

119.     Each of the claims for purported Glass Services that is identified in Exhibit "1" was submitted or caused to be submitted by the Defendants via interstate wire transmission from Shazam Glass in Florida, to GEICO's claims processing vendor in Columbus, Ohio.

120.     The Glass Services claims that the Defendants submitted or caused to be submitted to GEICO were false, misleading, and/or unlawful in that they:

(i)     involved phony Glass Services that were not necessary, reparative, or in some cases actually performed;

(ii)    were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and

(iii)   were submitted through Shazam Glass, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

121.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their purported performance of the Glass Services and their submission of charges to GEICO.

122.    To induce GEICO to promptly pay the fraudulent charges for the Glass Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

123.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Glass Services in an effort to prevent discovery that Shazam Glass never performed the underlying Glass Services, lacked valid assignments of benefits from the pertinent Insureds, and therefore lacked standing to collect on the Glass Services in the first instance.

124.    What is more, the Defendants knowingly misrepresented and concealed facts related to the purported Glass Services in an effort to prevent discovery that the Glass Services were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds, and in many cases involved purported Glass Services that were not necessary, reparative, or in some cases actually performed

125.    Furthermore, the Defendants deliberately avoided the ordinary notice of loss process and exploited Florida's claims handling requirements in order to force GEICO to process

their fraudulent claims within a highly abbreviated time-frame, and compel GEICO to rely on their facially-valid claims submissions.

126.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $340,000.00.

127.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
### Against Shazam Glass
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

128.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 127 above.

129.    There is an actual case in controversy between GEICO and Shazam Glass regarding more than $75,000.00 in fraudulent claims for the purported Glass Services that has been submitted through Shazam Glass to GEICO.

130.    Shazam Glass has no right to receive payment for any pending bills submitted to GEICO because Shazam Glass is not and never has been in compliance with the Repair Act.

131.    Shazam Glass has no right to receive payment for any pending bills submitted to GEICO because it did not actually provide the Glass Services at issue, and lacked valid assignments of benefits from the Insureds.

132.    Shazam Glass has no right to receive payment for any pending bills submitted to GEICO because the bills misrepresented that Shazam Glass was authorized by the pertinent Insureds to file a claim against their insurance policy, when in fact it was not.

133.    Shazam Glass has no right to receive payment for any pending bills submitted to GEICO because the purported Glass Services were, in many cases, not necessary, reparative, or in some cases actually performed.

134.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Shazam Glass has no right to receive payment for any pending claims submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Martineau
### (Violation of RICO, 18 U.S.C. § 1962(c))

135.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 127 above.

136.    Shazam Glass is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

137.    Martineau has knowingly conducted and/or participated, directly or indirectly, in the conduct of Shazam Glass' affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit or cause to be submitted hundreds of fraudulent claims for Glass Services on a continuous basis for more than three years seeking insurance payments under GEICO insurance policies that Shazam Glass was never entitled to receive because: (i) the claims involved phony Glass Services that were not necessary, reparative, or in some cases actually performed; (ii) the claims were the product of illegal, deceptive, unfair, and

manipulative conduct directed at GEICO Insureds; and (iii) the claims were submitted through Shazam Glass, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance because of the Defendants' pervasive violations of the Repair Act. A representative sample of the fraudulent bills and corresponding facsimiles submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

138.    Shazam Glass' business is racketeering activity, inasmuch as the enterprise exists solely for the purpose of submitting fraudulent charges to Florida automobile insurers.  The predicate acts of wire fraud are the regular way in which Martineau operates Shazam Glass, insofar as Shazam Glass was never eligible to bill GEICO or other automobile insurers for the Glass Services, and the acts of wire fraud therefore are essential in order for Shazam Glass to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of wire fraud implies a threat of continued criminal activity, as does the fact that attempts to collect on the fraudulent billing submitted through Shazam Glass continue to the present day.

139.    Shazam Glass is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Shazam Glass in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent Glass Services billing.

140.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $340,000.00 pursuant to the fraudulent claims submitted through Shazam Glass.

141. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Martineau and Shazam Glass**
**(Under Fla. Stat. § 501.201 et. seq.)**

142. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 127 above.

143. The Defendants are actively engaged in trade and commerce in the State of Florida.

144. GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

145. The Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain comprehensive insurance benefits from GEICO.

146. The bills and supporting documents submitted or caused to be submitted by the Defendants to GEICO were fraudulent and unlawful in that they: (i) involved phony Glass Services that were not necessary, reparative, or in some cases actually performed; (ii) were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and (iii) were submitted through Shazam Glass, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to seek reimbursement from GEICO for the claims in the first instance.

147. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of the Defendants has been materially injurious to GEICO and its Insureds.

148.   The conduct of the Defendants was the actual and proximate cause of the damages sustained by GEICO.

149.   The Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $340,000.00.

150.   By reason of the Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### FOURTH CAUSE OF ACTION
**Against Martineau**
**(Under Fla. Stat. § 772.103(3))**

151.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 127 above.

152.   Shazam Glass is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities that constitute a pattern of criminal activity.

153.   Martineau knowingly has conducted and/or participated, directly or indirectly, in the conduct of Shazam Glass' affairs through a pattern of criminal activity consisting of repeated acts constituting insurance fraud in violation of Fla. Stat. § 817.234(1)(a), by submitting or causing to be submitted hundreds of fraudulent claims to GEICO seeking payment under comprehensive insurance policies issued by GEICO to its Insureds, when the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) the claims involved phony Glass Services that were not necessary, reparative, or in some cases actually performed; (ii) the claims were the product of illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds; and (iii) the claims were submitted through Shazam Glass, which never actually performed the services, never obtained valid assignments of insurance benefits from the Insureds, and was ineligible to

seek reimbursement from GEICO for the claims in the first instance because of the Defendants' pervasive violations of the Repair Act.

154.     These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

155.     Shazam Glass is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Shazam Glass in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent insurance billing.

156.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $340,000.00 pursuant to the fraudulent bills submitted through the Shazam Glass enterprise.

157.     By reason of Martineau's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### FIFTH CAUSE OF ACTION
**Against Martineau and Shazam Glass**
**(Common Law Fraud)**

158.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 127 above.

159.     The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO in the course of their submission of hundreds of fraudulent and unlawful claims for purported Glass Services.

160.    The claims submitted to GEICO constituted false and fraudulent statements of material fact in that:(i) Shazam Glass never actually provided any Glass Services to GEICO Insureds, and lacked valid assignments of benefits from GEICO Insureds; (ii) the putative Glass Services that were not necessary, reparative, or in some cases actually performed; (iii) the claims falsely represented that Shazam Glass was eligible to receive payment for the purported Glass Services in the first instance, when in fact it was not because of Defendants' f illegal, deceptive, unfair, and manipulative conduct directed at GEICO Insureds, and pervasive violations of the Repair Act.

161.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Shazam Glass that were not reimbursable.

162.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $340,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Defendants through Shazam Glass.

163.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

164.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages in an amount to be determined at trial, but in no event less than $340,000.00, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against Martineau and Shazam Glass
### (Unjust Enrichment)

165.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 127 above.

166.    As set forth above, the Defendants have engaged in improper, unlawful, and/or

unjust acts, all to the harm and detriment of GEICO.

167.    When GEICO paid the bills and charges submitted or caused to be submitted by

the Defendants, it reasonably believed that it was legally obligated to make such payments based

on the Defendants' improper, unlawful, and/or unjust acts.

168.    The Defendants have been enriched at GEICO's expense by GEICO's payments

which constituted a benefit that the Defendants voluntarily accepted notwithstanding their

improper, unlawful, and unjust billing scheme.

169.    The Defendants' retention of GEICO's payments violates fundamental principles

of justice, equity and good conscience.

170.    By reason of the above, the Defendants have been unjustly enriched in an amount

to be determined at trial, but in no event less than $340,000.00.

## SEVENTH CAUSE OF ACTION
### Against Martineau and Shazam Glass
### (Under Fla. Stat. § 559.901, et. seq.)

171.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 127 above.

172.    Defendants repeatedly have violated, and continue to violate, the Repair Act.

Defendants' violations of the Repair Act include, but are not limited to: (i) unlawfully

subcontracting all of their purported Glass Services without notice to the Insureds; (ii) charging

for purported Glass Services that were not authorized by the Insureds; (iii) misrepresenting that legitimate Glass Services actually had been provided; (iv) misrepresenting that the Insureds' vehicles were in dangerous conditions, or that the continued use of the vehicles could harm the vehicles; (v) fraudulently altering customer contracts, estimates, work orders, and invoices, including through forgeries of the Insureds' signatures on those documents; (vi) knowingly making and authorizing written and oral statements that were untrue, deceptive, and misleading; (vii) making false promises to induce Insureds to authorize the purported Glass Services; (viii) causing and allowing Insureds to sign work orders that did not state the automobiles' odometer readings at the time of the purported Glass Services; (ix) failing to provide the Insureds with the specific statutory estimate waiver notice language in the form required by Section 559.905(2), or written repair estimates for the purported Glass Services; and (x) failing to provide Insureds with legible copies of the invoices for the purported Glass Services upon completion of the purported Glass Services, which set forth itemized descriptions of all labor, parts, and merchandise supplied and the costs thereof, and the current odometer readings of the motor vehicles.

173.    Defendants' conduct has caused harm to GEICO because Defendants have received payment from GEICO on Glass Services claims that Defendants are obligated to return to GEICO due to Defendants' violations of the Repair Act.

174.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory damages in an amount to be determined at trial, but in no event less than $340,000.00, together with interest, costs, and reasonable attorneys' fees.

## **JURY DEMAND**

175.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Shazam Glass, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Shazam Glass has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Martineau, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $340,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Martineau and Shazam Glass, compensatory damages in an amount to be determined at trial but in excess of $340,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

D.     On the Fourth Cause of Action against Martineau, compensatory damages in an amount to be determined at trial but in excess of $340,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

E.     On the Fifth Cause of Action against Martineau and Shazam Glass, compensatory damages in an amount to be determined at trial but in excess of $340,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Martineau and Shazam Glass, more than $340,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

G.     On the Seventh Cause of Action against Martineau and Shazam Glass,

compensatory damages in an amount to be determined at trial, but in no event less than

$340,000.00, together with interest, costs, and reasonable attorneys' fees.

Dated:        June 6, 2019

/s/ John P. Marino
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

Yonatan Bernstein (pro hac vice pending)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11550
Phone:  (516) 357-3000
Facsimile:  (516) 357-3333
yonatan.bernstein@rivkin.com

*Attorneys for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*